447 So.2d 284 (1983)
Council RUDOLPH, William Windauer, and Floyd Wells, Appellants,
v.
MIAMI DOLPHINS, LTD., Insurance Company of North America, and the Division of Workers' Compensation of the Florida Department of Labor & Employment Security, Appellees.
Nos. AM-381, AN-79 and AN-77.
District Court of Appeal of Florida, First District.
December 30, 1983.
Rehearing Denied March 13, 1984.
*286 Edward Schroll, Miami, for appellants.
Adams, Kelley, Kronenberg & Rutledge, Miami, for appellees.
ZEHMER, Judge.
Three professional football players, Council Rudolph, William Windauer, and Floyd Wells, formerly with the Miami Dolphins football team, appeal from orders denying them worker's compensation benefits. Each of the appellants was under contract with the Miami Dolphins, Ltd., pursuant to a National Football League Players contract and a collective bargaining agreement between club members of the National Football League and player members of the NFL Players Association. Appellants sustained injuries while in training camp prior to the beginning of the regular football season, and each was subsequently terminated by the Dolphins. They filed separate claims for disability compensation under the Florida Workers' Compensation Act. Medical benefits had been provided by the Dolphins and were not claimed. Each deputy commissioner denied benefits on the primary ground that section 440.02(1)(c)3, Florida Statutes, excludes professional football players from coverage under the act. In view of the similarity of the orders, the issues, and the factual circumstances, we have consolidated the three cases on appeal.[1] The issue is whether the deputy commissioners erred in finding that appellants were not entitled to *287 benefits under the Florida Workers' Compensation Act. We affirm.
Section 440.02(1)(c)3 provides, for purposes of coverage under the act, that the term "employment" does not include "service performed by or as a professional athlete" such as a "football player." Miami Dolphins, Ltd., is a professional football club and a member of the National Football League. Each of the claimants is a member of the National Football League Players Association.
The Miami Dolphins qualified as a self-insured employer under the Florida Workers' Compensation Act. Until 1971, the Dolphins complied with the requirement of the act as a self-insured and provided worker's compensation benefits for all of its employees, including the players. In 1971, the Dolphins advised the Division of Worker's Compensation that it no longer was waiving the professional athlete exclusion in section 440.02 and that coverage would not be provided to players, although coverage as a self-insured would continue as to all other employees. At the time of the injuries to appellants, the Dolphins had not again served notice of its election to waive the statutory exemption pursuant to section 440.04, Florida Statutes.
In addition to the collective bargaining agreement, the Dolphins, utilizing the NFL player contract form, entered into a specific contract with each appellant. This contract specified the amount of salary that would be paid for playing with the team during the regular season. It also provided that during pre-season training camp the player would receive compensation equal to ten percent of the agreed salary, payable in weekly installments during pre-season, plus board, lodging, and transportation expenses.
At the time of his injury, Council Rudolph was a thirty-one year old college graduate who had played professional football as a defensive end for approximately seven years. He had played for the Houston Oilers, the St. Louis Cardinals, and the Tampa Bay Buccaneers prior to being traded to the Miami Dolphins. He had served as player representative while with the Tampa Bay Buccaneers and was under contract with the Buccaneers to play professional football for $65,000 per season. After playing two seasons for Tampa Bay, Rudolph was traded to the Dolphins and his contract of employment was assigned to the Dolphins. He reported to the Dolphins' pre-season camp on July 13, 1978, began practice and, during a pass-rush drill, injured his left leg. At the time of this injury, Rudolph had been issued neither uniforms nor the Dolphins playbook, which allegedly contained advice to Dolphins players that they were not covered by worker's compensation. Rudolph thereafter returned to limited practice, but reinjured his leg. After Rudolph played on quarter in a pre-season game on August 23, the Dolphins released him from his contract. Rudolph did not play in any regular season game for the 1978 football season, but was paid under his salary contract until released by the Dolphins. Rudolph filed a grievance under provisions of his contract and was awarded $15,000.
Floyd Wells, twenty-four years old at the time of his injury, attended college for two years but left school in 1977. He had never played college football and only played football a short time in high school. Desiring to become a member of the Miami Dolphins, he went to a tryout camp which lasted three days, but was not hired at that time. A few weeks later, he was called by the Dolphins and signed a contract on May 22, 1980, under which the Dolphins agreed to pay him $27,000 per year for playing as a wide receiver if he made the team roster. Wells reported to camp on July 13, 1980, where, pursuant to his contract, he was given lodging and board and paid compensation based on ten percent of his agreed salary. Camp was to last until September 7, 1980, when the regular season began. Wells, however, never made the regular season. On July 19 and 26, he sustained injuries to his left knee and became unable to participate in training. The Dolphins terminated Wells' contract and placed him on waivers. Wells testified that he never *288 made the team roster, never played in any game for the Miami Dolphins, and, in his opinion, never became a professional football player. In response to a grievance against the Miami Dolphins filed by Wells, the executive vice president of the Dolphins indicated that Wells lacked sufficient skills to make the Dolphins team roster at the time of his release. Wells was paid under his contract until October 12, 1980.
William Windauer, a thirty-three year old university graduate at the time of his injury, had played defensive tackle and offensive guard as a professional football player with the Baltimore Colts, the New York Giants, and the Atlanta Falcons prior to coming to the Miami Dolphins. Windauer had a two-year contract with the Dolphins, and his base salary was $35,000 for services during the 1977 season and $39,000 during the 1978 season. In July 1977, Windauer sustained abdominal injuries and a pinched nerve in the neck during pre-season camp. Surgery failed to clear up his problems and he apparently did not play during the 1977 regular season. Windauer returned to camp in 1978 but was advised by the team physician that he could not play football and has played none since. After termination of his contract, Windauer received one-half of the stipulated salary, which was paid out in June 1979.
Since none of the appellants believed they had received benefits equivalent to worker's compensation benefits provided by the Florida act, each filed appropriate claims. The Dolphins defended on the basis that appellants were not covered by the act because of the statutory exclusion of football players from the definition of employee.
On appeal, appellants seek reversal of the orders, urging in the following points that:
1. They were not engaged as professional athletes at the time of their injuries;
2. The Dolphins contracted with them to provide statutory worker's compensation benefits;
3. The Dolphins waived the exclusion from coverage for professional athletes;
4. The Dolphins are estopped to deny coverage for appellants; and
5. The professional athlete exclusion provision in section 440.02(1)(c)3 is unconstitutional.
Regarding the first point, we agree with appellants' statement that the worker's compensation act should be liberally construed so that every doubt is to be resolved in favor of coverage and every exclusion is to be given limited scope by restrictive interpretation. Levine v. The Miami Herald, 7 FCR 278 (Feb. 20, 1973), cert. den., 280 So.2d 682 (Fla. 1973). See also, Sam Rogers Enterprises v. Williams, 401 So.2d 1388 (Fla. 1st DCA 1981); LaBrecque v. Florida Vocational Rehabilitation & Division of Risk Mgt., 380 So.2d 482 (Fla. 1st DCA 1980). In Miranda v. Southern Farm Bureau Casualty Insurance Co., 229 So.2d 232 (Fla. 1969), the Supreme Court said of the agricultural laborer exclusion in section 440.02, "any doubt as to the claimant's status in `grey' or borderline cases will be resolved in favor of compensation coverage and against exclusion." 229 So.2d at 235. We disagree, however, with appellants' contention that they were not engaged as professional football players at the time of their respective injuries. We do not believe the statutory exclusion of professional athletes becomes applicable only when persons are playing during the regularly scheduled football season after making the team roster. The exclusion becomes operative whenever a professional athlete is injured incident to performing the contemplated activities of his employment as a professional athlete, whether during pre-season camp, during regular season practice, or during a regularly scheduled game. Each appellant was injured in actual athletic training or competition that was required by his contract of employment,[2] and for which he was receiving compensation.
*289 Nor are we persuaded by appellants' argument that they should not be treated as professional football players because they were injured while competing with other players for a permanent position on the club's roster. Appellants argue that they could not become professional players until selected for the roster because under their contract the Dolphins could terminate a player without further obligation or compensation if the player did not successfully compete and earn such position.[3] But we are persuaded that the professional athlete exclusion does not become operative only upon achieving a permanent position on the club's roster; it is applicable at all times a player participates in training and other athletic endeavors required of him in his efforts to make the team roster, as long as the player is under contract and being compensated for his services during such training activity.
Rudolph and Windauer were obviously veteran professional football players. Rudolph was injured during training and a pre-season football game while playing under the professional contract assigned by the Tampa Bay Buccaneers to the Dolphins. Windauer, playing under his two-year contract, was injured during an intrasquad scrimmage while tackling the quarterback. We believe it would unnecessarily strain the language of section 440.02 to attempt to construe their activities as not falling within the professional football player exclusion. Wells' situation presents a closer question. He had signed a contract with the Miami Dolphins that designated him a professional athlete and recited that he possessed special and unique skills as a football player that qualified him to participate in professional football. Although Wells had not previously been employed as a professional athlete and never did make the team roster, his activities at the time of his injury were likewise required by his employment contract, and he was receiving compensation for such activities whether or not eventually selected for the team roster. His compensation continued until October. We conclude, therefore, that the record contains substantial competent evidence to support the deputy's finding that each appellant was injured while engaging in activity as a professional athlete within the statutory exclusion.
The thrust of appellants' argument in support of the second point is that article XXXIII of the collective bargaining agreement[4] obligated the Miami Dolphins to provide each appellant with statutory worker's compensation benefits or guarantee equivalent benefits to them, and that this provision *290 amounted to a contract to provide worker's compensation coverage, which should be enforced by the deputy commissioner under Dyalwood, Inc. v. L.R. Thomas, 122 So.2d 314 (Fla. 1960), and Rainey v. Lafayette Grill, Inc., 2 FCR 208 (December 28, 1956), cert. den., sub. nom. Century Indemnity Co. v. Rainey, 97 So.2d 304 (Fla. 1957). Appellants attempt to buttress their argument by emphasizing the provisions in paragraph 10 of their respective NFL Player contracts that "[a]ny compensation paid to Player under this contract ... for a period during which he is entitled to workmen's compensation benefits ... will be deemed an advance payment of workmen's compensation benefits due Player."
We could agree with appellants' position if article XXXIII and paragraph 10 contractually obligated the Dolphins to provide worker's compensation coverage under the statute. Paragraph 10, however, is applicable only if the Dolphins have otherwise elected to provide worker's compensation coverage by waiving the professional athlete exclusion. The language of article XXXIII requires only that the Dolphins either (1) voluntarily obtain coverage under the state's worker's compensation law or (2) otherwise guarantee equivalent benefits to its players. A guarantee of equivalent benefits is not the same as coverage under the act because article XXXIII expressly provides, in addition, that nothing stated therein is to be interpreted as preventing a club that has a legal right to do so from rejecting coverage under the worker's compensation laws of any state. Article XXXIII did not create an enforceable right in every player to receive statutory worker's compensation benefits and, thus, did not give rise to coverage of appellants at the time of their injuries. Rather, given the most liberal construction, that article only contractually obligated the Dolphins to otherwise provide its players with benefits equivalent to statutory worker's compensation benefits if the Dolphins elected not to waive the statutory exclusion of professional players. This contractual obligation could be satisfied in many ways other than through coverage under the act enforceable by a deputy commissioner.
Each appellant's NFL Player contract provided in paragraph 9 that in the event of injury the Dolphins would provide "such medical and hospital care during the term of this contract as the club physician may deem necessary" and that such player would "continue to receive his yearly salary for so long during the season of injury only ... as Player is physically unable to perform the services required of him by this contract because of such injury." Accordingly, the Dolphins were contractually obligated to provide each appellant with appropriate medical care, continue his salary under the stated condition, and provide other compensation necessary to guarantee that the players received benefits "equivalent" to worker's compensation benefits under the Florida act. But the deputy commissioners were without jurisdiction to determine claims based only upon private contract rights. U.S. Home Corp. v. Parker, 404 So.2d 170 (Fla. 1st DCA 1981); TRW, Inc. v. Betts, 407 So.2d 377 (Fla. 1st DCA 1981). Dyalwood, supra, and Rainey, supra, are inapposite since the rights appellants sought to enforce in this case are purely contractual in nature and are not derived from the worker's compensation statute or a policy of insurance obtained to meet such statutory requirements. The deputy commissioners were entirely correct in declining to enforce appellants' contractual rights, even though the value of those rights may have to be measured by comparison to worker's compensation benefits.
In regard to the third point, we agree with appellee that the deputy commissioners did not err in failing to find that the Dolphins waived the professional athlete exclusion by purchasing an excess worker's compensation insurance policy covering listed players, coaches, managers, and umpires. Appellants' argument on this point is predicated on section 440.04(2), Florida Statutes, which provides that the purchase and acceptance of worker's compensation insurance specifically covering *291 otherwise excluded employees constitutes a waiver of the exclusion of those employees from the act. The Dolphins were self-insured for worker's compensation benefits up to $100,000, and the insurance policies referred to provide excess coverage above that amount. The remuneration paid to all players, including appellants, was included in the policy declarations. That being so, appellants argue, this excess insurance constitutes direct worker's compensation insurance covering appellants and the Dolphins' purchase thereof amounts to a waiver of the professional athlete exclusion under section 440.04(2). The excess coverage policy here involved also, however, provides by special endorsement:
In consideration of the reduced rates shown in the declarations, it is agreed that this policy does not apply to the payment of compensation benefits to any professional football player on the salary list of the Miami Dolphins, Ltd. However, this exclusion shall not apply as respects payments of medical benefits, which shall include but not be limited to medical, surgical and hospital treatment, nursing, medicines, medical and surgical supplies, crutches and apparatus, artificial limbs, and transportation charges, required by the workers' compensation law or any occupational disease law of the state designated in the declarations. (Emphasis supplied)
This provision explicitly negates any purpose or intention that might be implied from the act of purchasing the excess insurance to waive the professional athlete exclusion regarding payment of compensation benefits and create coverage of such employees.
We note that the second sentence of the quoted endorsement relates to medical benefits "required by the worker's compensation law." Medical benefits, however, were provided by the Dolphins under the employment contracts. Whether that sentence may be construed to secure coverage for statutory worker's compensation medical benefits to each player is not a question we need answer on this appeal since all three appellants have not claimed medical benefits, but only disability compensation and wage-loss benefits. The deputy commissioners did not err in failing to find a waiver of the exclusion by purchase of the excess insurance policies.
The appellants' argument in support of the fourth point is likewise without merit. We find no record support for appellants' contention that the employer is estopped to deny worker's compensation coverage for the appellants. The requisite elements of estoppel were not proven by the evidence.
Finally, appellants argue that the exclusion in section 440.02 is unconstitutional as applied to them because it denies equal protection of the law, in violation of the Fourteenth Amendment to the United States Constitution and Article I, Section 2, of the Florida Constitution. No decisions are cited by appellants in support of their somewhat confusing argument on this point. It is well established, however, that in passing upon the constitutionality of a statute, we must indulge every presumption in favor of its validity. The equal protection clause does not invalidate a statute unless the legislation fails to "bear some reasonable relationship to a legitimate state purpose" and causes "different treatment so disparate as relates to the difference in classification so as to be wholly arbitrary." In re Estate of Greenberg, 390 So.2d 40, 42 (Fla. 1980). The professional athlete exclusion is not a wholly arbitrary one. Professional football players incur serious injuries on a regular, frequent, and repetitive basis. They are generally well paid, and as the NFL contracts in these cases exemplify, they willfully hold themselves out as well-skilled in the sport of their choice. They make a conscious decision to use their skills in an occupation involving a high risk of frequent, repetitive, and serious injury. We cannot say that the legislature's exclusion of this voluntary, though highly dangerous, activity from the worker's compensation act fails to bear some reasonable relationship to a legitimate state purpose and is so completely *292 arbitrary and lacking in equality of application to all persons similarly situated as to violate the cited constitutional provisions.
Moreover, appellants have certain contractual rights with their employer which protect their interests in the event they sustain injuries such as occurred in these cases, and they have been free to pursue those contractual rights, either by the stipulated grievance procedure, arbitration, or by civil action in a court of law. The provisions of section 440.11 granting employers immunity from suit are not applicable to bar suit by these players against the Miami Dolphins.
Finding no reversible error in the three orders dismissing appellants' claims for worker's compensation benefits, they are AFFIRMED.
ROBERT P. SMITH, Jr. and WENTWORTH, JJ., concur.

ON MOTION FOR REHEARING
ZEHMER, Judge.
Appellants have filed a petition for rehearing in which they contend, among other things, that we mistakenly concluded that "all three appellants have not claimed medical benefits" and erroneously declined to reach the merit of their contention that the Dolphins waived the professional athlete exclusion by obtaining insurance coverage for such medical benefits.
As recited in our original opinion, the record reflects that medical benefits had been provided to appellants in accordance with the employment contract and that there were no specific claims for medical care pending at the time of the workers' compensation hearing. The record also reflects, however, that appellants Wells and Rudolph had, at one time or another, asserted a general claim for medical benefits. Although the record contains no specific claim by appellant Windauer for medical benefits, it does contain a letter from Windauer's counsel to the Division of Workers' Compensation advising of his representation of Windauer regarding "his claim for both compensation and medical benefits." In order to finally resolve the contested matters in this litigation, we will consider these claims for medical benefits as though properly pending and determine the question not answered in our original opinion, i.e., whether the language of the second sentence of the special endorsement to the insurance policy should be construed to secure coverage for statutory workers' compensation medical benefits to each player.
We concluded in our original decision that express language of the quoted endorsement "negates any purpose or intention that might be implied from the act of purchasing the excess insurance to waive the professional athlete exclusion regarding payment of compensation benefits and create coverage" of the appellants. We do not believe that the language of the second sentence regarding coverage for medical benefits overcomes the Dolphins' manifest intent not to waive the professional athlete exclusion. The insurance so obtained simply provides the Dolphins with a means of reimbursement for certain medical expenses that they may become obligated to pay under the players' contracts. Existence of this insurance coverage does not affect appellants' right to secure medical benefits under their employment contract, if denied, by suit in a court of competent jurisdiction.
Except for this clarification, the appellants' petition for rehearing is in all other respects DENIED.
WENTWORTH and BARFIELD, JJ., concur.
NOTES
[1] Ralph Ortega, another professional football player formerly with the Miami Dolphins who presently has similar worker's compensation claims pending, was permitted to file an amicus curiae brief. We have considered the arguments in his brief along with those of appellants.
[2] Each appellant's contract required him to "report promptly for and participate fully in Club's official pre-season training camp, all Club meetings and practice sessions, and all pre-season, regular season and post-season football games scheduled for or by the Club."
[3] Paragraph 11 of the NFL Players contract provided:

SKILL, PERFORMANCE AND CONDUCT. Player understands that he is competing with other players for a position on Club's roster within the applicable player limits. If at any time, in the sole judgment of Club, Player's skill or performance has been unsatisfactory as compared with that of other players competing for positions on Club's roster, or if Player has engaged in personal conduct reasonably judged by Club to adversely affect or reflect on Club, then Club may terminate this contract.
[4] Article XXXIII of the collective bargaining agreement between the league and the players association provided in part:

WORKMEN'S COMPENSATION:
Section 1. Benefits: In any states where Workmen's Compensation coverage is not compulsory, a club will either voluntarily obtain coverage under the compensation laws of that state or otherwise guarantee equivalent benefits to its players. In the event that a player qualifies for benefits under this section, such benefits will be equivalent to those benefits paid under the workmen's compensation law of the state in which his club is located.
Section 2. Rejection of Coverage. Nothing herein stated is to be interpreted as prevening a club, which has the legal right to do so, from rejecting coverage under the workmen's compensation law of its state. However, if a club elects to reject coverage under the workmen's compensation law of its state, it must nevertheless guarantee benefits to its players in the manner previously prescribed in Section 1 above. Moreover, any club may be excluded from those laws if it elects to do so. However, such a club will be obligated to guarantee benefits to its players in the manner previously prescribed in Section 1 above.